IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW SANDEEN,<br><br>Defendant. | CR. NO. 19-00167 JAO<br><br>**ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS, ECF NOS. 93, 94, AND 95** |

**ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS, ECF NOS. 93, 94, AND 95**

Before the Court are pro se Andrew Sandeen's ("Sandeen" or "Defendant")

three Motions to Suppress,[1] ECF Nos. 93, 94, and 95 ("the Motions").[2]  After

considering the parties' briefs and the testimony and exhibits submitted at an

---

[1]  The Motions are titled as follows:  Defendant's Motion to Suppress:  Motion to Suppress Fruits of Initial Warrantless Seizures of Defendant, and the Vehicle Defendant Arrived in on November 19, 2019 [ECF No. 93]; Defendant's Motion to Suppress Fruits of Warrantless Search and Seizure of a Backpack and the Warrantless Search and Seizure of Defendant's and [sic] Vehicle [ECF No. 94]; Defendant's Motion to Suppress Any and All Statements, Oral/Written/Recorded or Videoed Made to HSI/HPD in Violation of the Defendant's Fifth and Sixth Amendment Constitutional Rights on the Evening of November 19, 2019 [ECF No. 95].

[2]  The Court will address Defendant's Motion for Relief Pursuant to the Omnibus Crime Control and Safe Street Act of 1968 in Violation of 18 U.S.C. § 2515 and 18 U.S.C. § 3504(1)(A) for Claims of a Party Aggrieved by Evidence Inadmissible Due to It Being Obtained through an "Unlawful Act," ECF No. 92, by way of a separate written order.

evidentiary hearing, and incorporating its June 1, 2021 oral findings and conclusions rendered at the end of the hearing,[3] the Court DENIES the Motions for the following reasons.

## BACKGROUND

On March 17, 2021, the Grand Jury returned a Superseding Indictment charging Sandeen with possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A) and including a special allegation that before committing the subject offense, Sandeen had a final conviction in the Circuit Court, State of Hawaiʻi, for Robbery 2 under Hawaiʻi Revised Statutes § 708-841(1)(b) — a serious violent felony — for which he was sentenced to a ten-year term of imprisonment and served more than 12 months.  ECF No. 65.

Sandeen filed the Motions on April 2, 2021.  ECF Nos. 93, 94, 95.  The Government filed an Opposition on April 19, 2021, ECF No. 113, and Sandeen filed a Reply on May 19, 2021.  ECF No. 155.  The Court held an evidentiary hearing on June 1, 2021.  ECF No. 194.

---

[3] In the event anything in this Order contradicts the Court's oral findings and conclusions, this Order controls.

DISCUSSION

A.   Findings of Fact

At the evidentiary hearing held on June 1, 2021, the Court took testimony from four witnesses:  Homeland Security Investigations ("HSI") Special Agent Ryan Faulkner ("SA Faulkner"), Hawaiʻi County Police Department ("HPD") Officer Nicholas McDaniel ("Officer McDaniel"), Viliseni Matiaki ("Matiaki"), and HSI Special Agent Ivan Young ("SA Young").  Having had the opportunity to evaluate each witness' demeanor and listen to each's responses to direct and cross examination, the Court finds each credible.  The Court also takes into consideration SA Faulkner's more than 20 years of experience investigating drug crimes,[4] and Officer McDaniel's several years of experience as a narcotics officer.

---

[4]  Although the Court finds SA Faulkner credible, it is troubled by paragraph 6 of the Affidavit in Support of Criminal Complaint in this matter, which Sandeen attempted to use to impeach SA Faulkner's credibility.  Specifically, SA Faulkner stated in Paragraph 6:

> On November 19, 2019, . . . [SA] Ryan Faulkner received information from a reliable confidential source that Andrew SANDEEN was in possession of a distribution level amount of methamphetamine in Kailua-Kona in Hawaii County.  Your affiant found the source reliable because he/she provided information contrary to his/her penal interest.  The source also had previously provided information concerning drug trafficking to your affiant that was determined to be true.

ECF No. 1 at 4.  SA Faulkner testified at the hearing that he had never met Matiaki before his arrest, and that the term "previously" related to information Matiaki provided during his post-arrest statement on November 19, 2019.  While the

(continued . . .)

Based on the witnesses' testimony and exhibits, the Court finds as follows:

1.   *The Buy Bust Operation*

On November 19, 2019, SA Faulkner arrested Matiaki for federal drug and gun crimes, and Matiaki agreed to cooperate with law enforcement.  Matiaki informed the agents that he already had a two-pound drug deal planned for later that day with someone named "Drew."  Matiaki provided SA Faulkner with Sandeen's phone number.  After sharing Matiaki's description of Drew with HPD officers, SA Faulkner was able to determine that Drew was likely Sandeen. Matiaki identified a photo of Sandeen as Drew.

Working with Matiaki, HSI and HPD planned a "buy bust" operation at the Walmart in Kailua-Kona for that same day.  SA Faulkner was present for the first of two phone calls between Sandeen and Matiaki.  During the call, Matiaki asked, "What's up with that 'brown stuff?'"  Exhibit 1A.  SA Faulkner explained that "brown stuff" is slang for heroin.  Sandeen responded, that he had "plenty" of it, and that they could discuss it when they saw one another.

---

(. . . continued)
paragraph as written does not foreclose the possibility that Matiaki provided this "previously" reliable information on November 19, 2019, it can more easily be interpreted to mean that Matiaki provided reliable information *prior* to November 19, 2019.

Nonetheless, the Court finds SA Faulkner credible based on his demeanor, the corroboration of his testimony by the evidence, and the fact that he earnestly answered questions without embellishment during the hearing.

Matiaki made a second call to Sandeen to arrange the meeting, during which Officer McDaniel and SA Young were present.  The second call was also recorded. During the call, Matiaki arranged with Sandeen to meet at Walmart and Sandeen said that he had a "big bindle," but did not have the right bag for them.  Exhibit 1C. Sandeen stated, "I just gotta double-check the weight on everything and organize it." *Id*.  When asked whether Sandeen did not have enough, Sandeen responded, "I just wish I had one big bag that I could put it all in, I'll go take care of it right now." *Id*.  SA Faulkner testified that he interpreted this conversation to mean that Sandeen had quantities of illegal drugs for Matiaki.

Between the two calls, SA Faulkner transported Matiaki to his residence in order to retrieve his vehicle.  Officer McDaniel and another agent searched Matiaki and the vehicle and recovered no contraband or weapons during the pre-operational search.

To conduct the buy bust operation, law enforcement utilized two different methods of capturing the conversations between Matiaki and Sandeen:  (1) an audio recording device that was not capable of transmitting live sound; and (2) an open telephone call ("the open call") between Matiaki and law enforcement, through which the agents listened live to the deal while remaining muted.  Matiaki was not only aware of the use of both, he placed the audio recording device in his

sunroof and moved the telephone used for the open call to a position near his car's drink holder.

SA Faulkner, SA Young, and Officer McDaniel followed Matiaki as he drove alone to Walmart to meet with Sandeen. At the time, the cellular phone in Matiaki's car was on and the open call was working. Matiaki broke the live feed once in order to engage in a phone call with someone, but reinitiated the open call in time for the buy bust operation. Agents kept Matiaki's car under constant surveillance, and others were tasked with looking out for and surveilling any car in which Sandeen arrived.

Over police radio, SA Faulkner heard that Sandeen had arrived at the Walmart parking lot in a vehicle, exited the vehicle, and headed toward Matiaki's car. Officers monitoring the events radioed that Sandeen entered Matiaki's vehicle, which SA Faulkner could hear happening via the open line in Matiaki's car. Matiaki then drove onto Henry street and SA Faulkner followed Matiaki's vehicle.

The recording device recorded the conversation between Matiaki and Sandeen in Matiaki's car, which the agents listened to live via the open phone call. Matiaki complained to Sandeen that "that last stuff was wet," and Sandeen assured him that "this stuff is dry." Exhibit 1B. Matiaki said, "Let's see what's cracking," at which point there was a sound like the crinkling of plastic, and Sandeen

6

responded, "This is two.  It's a little over."  Exhibit 1B.  Matiaki asked, "Why is it all smashed up?"  Sandeen explained that "it came in a big thing and I just was trying to weigh it out."  Exhibit 1B.

SA Faulkner testified that, based on his training and experience, "This is two" meant that the drugs weighed two pounds, which was consistent with the originally planned deal between Matiaki and Sandeen.  He also explained that the discussion that the drugs were "dry" related to the appearance of the drugs, as drug users believe that there is some relationship between the appearance of methamphetamine and its quality.

2.    *The Searches of the Cars*

Agents then pulled over Matiaki's vehicle and arrested Sandeen.  They immediately searched the car and discovered a black backpack in the front passenger area that was not in the car when they searched it prior to the operation. The backpack contained what appeared to be methamphetamine.

Upon the stop of Matiaki's vehicle, SA Faulkner directed the officers who were watching the car Sandeen arrived in to search that vehicle.  It is undisputed that Sandeen's girlfriend was in that vehicle, and that the vehicle belonged to Sandeen.  Agents recovered a cellular telephone from the driver's side of that vehicle.  The parties also appear to not dispute the fact that some drugs were found in Sandeen's vehicle, although this detail was not elicited at the hearing.

3.    *The Interrogation*

SA Faulkner transported Sandeen to the Kona police station.  On the way there, SA Faulkner identified himself, told Sandeen he was under arrest and that he was taking him to the police department, and that they could talk further once they got there.  They did not discuss anything about Sandeen's girlfriend's whereabouts or her possible arrest.

Once at the police station, SA Faulkner interrogated Sandeen with Officer McDaniel present.  *See* Exhibit 1D.  The interview was recorded via audio and video and depicts SA Faulkner advising Sandeen of his rights, at which time Sandeen remarked that he was willing to talk to SA Faulkner, but he "just want[ed] to get [his] girlfriend outta here."  *Id*.  SA Faulkner explained to Sandeen, "Whether you talk or not isn't going to like trigger if she's out in five minutes. . . . I just can't promise you anything — that's super important that you understand. . . . All I can promise is I'll work with you to the extent I'm allowed."  Sandeen then initialed each of the rights read to him and signed the waiver of rights form. Exhibit 2.

B.    Conclusions of Law

In essence, Sandeen argues that law enforcement did not have reasonable suspicion to stop Matiaki's car, probable cause for Sandeen's arrest, probable cause to conduct a warrantless search of Matiaki's vehicle or Sandeen's vehicle,

nor probable cause for the warrantless search or seizure of the backpack in Matiaki's car.  *See* ECF Nos. 93, 94.  He also moves to suppress all of his statements made to SA Faulkner as fruits of his illegal arrest and rendered without a knowing, intelligent, and voluntary waiver of his Fifth and Sixth Amendment rights because SA Faulkner coerced him into waiving his rights and Sandeen was intoxicated at the time of the waiver.  *See* ECF No. 95.

The Court concludes that there was ample reasonable suspicion for the stop of Matiaki's car; probable cause for Sandeen's arrest and the search of Matiaki's vehicle, the backpack therein, and Sandeen's vehicle; and that the vehicle exception to the warrant requirement allowed for the searches of each.  The Court further concludes that Sandeen knowingly, intelligently, and voluntarily waived his *Miranda*[5] rights and that the statement he made to SA Faulkner was not the result of coercion.

1.   *The Stop of Matiaki's Vehicle and Sandeen's Arrest*

Police may stop a vehicle for a brief investigation where they have reasonable suspicion to do so, or "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (internal quotation marks and citations omitted).  "Although a mere 'hunch' does not create reasonable suspicion, the level of

---

[5]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

suspicion the standard requires is . . . obviously less than is necessary for probable cause." *Id.* (some internal quotation marks and citations omitted).

The Fourth Amendment's protection against unreasonable searches and seizures "'safeguard[s] the privacy and security of individuals against arbitrary invasions by government officials.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (citation omitted). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted). If there was not, then the fruits of that arrest are inadmissible under the Fourth Amendment. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). The Government bears "[t]he burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (citation omitted).

The probable cause inquiry is not "reduc[ible] to a neat set of legal rules" and requires the Court to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks and citations omitted). Such examination must take into account the totality of the circumstances, and the

determination of probable cause "turn[s] on the assessment of probabilities in particular factual contexts." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (internal quotation marks and citation omitted).

At the time of the stop of Matiaki's vehicle and Sandeen's arrest, agents:  (1) were aware that Matiaki had, prior to his arrest, arranged for the purchase of two pounds of methamphetamine from Sandeen; (2) listened to two phone conversations between Matiaki and Sandeen arranging to meet at Walmart to conduct the drug deal; (3) witnessed Sandeen arrive at the Walmart parking lot and enter Matiaki's vehicle; and (4) listened as Sandeen showed Matiaki the drugs in the car and described its weight and appearance.  There was more than ample reasonable suspicion to stop Matiaki's vehicle, and certainly sufficient probable cause to arrest Sandeen.

2.    *The Vehicle Searches*

 "[A] person claiming a Fourth Amendment violation must, as an initial matter, demonstrate a legitimate expectation of privacy in the place searched or the thing seized." *United States v. Gamez-Orduno*, 235 F.3d 453, 458 (9th Cir. 2000) (internal quotation marks and citation omitted).  While "[a] citizen does not surrender all the protections of the Fourth Amendment by entering an automobile," *New York v. Class*, 475 U.S. 106, 112 (1986) (citations omitted), the automobile exception allows for the warrantless searches of vehicles and the containers within

them where there is probable cause to believe that contraband or evidence is contained within the vehicle and its containers. *See Scott*, 705 F.3d at 417; *United States v. Ross*, 456 U.S. 798, 825 (1982). This automobile exception was borne out of the recognition that "the opportunity to search [a vehicle] is fleeting since a car is readily movable[,]" and the reduced expectation of privacy in vehicles due to the extensive regulation of vehicles that travel on public roads. *California v. Carney*, 471 U.S. 386, 390–92 (1985) (internal quotation marks and citation omitted).

The application of the automobile exception does not depend on whether the driver of that vehicle has already been arrested or the vehicle's immediate mobility extinguished. *See Scott*, 705 F.3d at 417. Thus, if a vehicle is readily operable and is "used as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling," police armed with probable cause can search the vehicle without a warrant because "the overriding societal interest in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable." *Id.* at 417 (internal quotation marks, brackets, and citation omitted).

For the same reasons that there was probable cause for Sandeen's arrest, there was probable cause for the search of Matiaki's vehicle. Regarding the backpack in particular, the agents did not find a backpack during the pre-operation

12

search of Matiaki's car, and so there was certainly probable cause to believe that Sandeen had brought the backpack found in the front passenger area where Sandeen was seated and that the backpack contained drugs.

There was also probable cause for the agents to believe that evidence of the crimes would be found in the vehicle in which Sandeen arrived to sell the drugs to Matiaki.  Agents witnessed him arrive in the vehicle, get out of it, and head directly to Matiaki's vehicle, where the two engaged in a conversation about the drugs that Sandeen showed Matiaki.  During the phone calls prior to the buy bust operation, Sandeen told Matiaki that he had "plenty" of drugs and said that he had to "organize" it for sale to Matiaki.  An objectively reasonable officer considering these circumstances could have concluded there was probable cause to believe that evidence of drug dealing would be found in Sandeen's vehicle.  While some of the details about the search itself were not presented to the Court, it is clear that the car was readily mobile and was the type of vehicle that is regulated by traffic laws and not the equivalent of a fixed dwelling.

Because there was probable cause for the searches of both cars, the vehicle exception to the Fourth Amendment's warrant requirement applies.

3.    *The Custodial Interrogation*

The Fifth Amendment guarantees that individuals will not "be compelled in any criminal case to be a witness against [themselves]."  U.S. Const. amend. V.

13

"Requiring Miranda warnings before custodial interrogation provides 'practical reinforcement' for the Fifth Amendment right." *New York v. Quarles*, 467 U.S. 649, 654 (1984) (citation omitted).  The Government must prove a *Miranda* waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Statements obtained through custodial interrogation are inadmissible where they are the product of police coercion. *See Oregon v. Elstad*, 470 U.S. 298, 305 (1985).  Voluntariness of a confession is evaluated based on the totality of the circumstances. *See Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988).   Coercion need not rise to the level of physical violence; threats of violence or mental coercion may render an interrogation unconstitutional. *See Fulminante*, 499 U.S. at 287.

In order to meet its burden by a preponderance of the evidence that a defendant voluntarily waived his *Miranda* rights, the Government must show that "under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of such abandonment." *United States v. Crews*, 502 F.3d 1130, 1139–40 (9th Cir. 2007) (citation omitted).  In *Crews*, the Ninth Circuit outlined factors courts are to consider when conducting this evaluation:

> (i) the defendant's mental capacity, (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised

14

> in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system.

*Id*. at 1140 (citation omitted).

Central to Sandeen's argument is that his mental capacity was hindered by intoxication. But there was no direct evidence offered at the hearing that Sandeen was under the influence of anything. The only evidence that might suggest that he was intoxicated at the time of the interrogation were comments that Matiaki made to Sandeen during their recorded contacts that Matiaki thought Sandeen might have been high. But Sandeen told Matiaki that he had passed a urinalysis earlier that day and was "sober." *See* Exhibit 1B. Moreover, the video of the interrogation does not offer any sign of Sandeen's intoxication and Sandeen asked wise questions in the course of the interrogation, suggesting that he was not under the influence of alcohol or drugs.

The remaining *Crews* factors easily weigh in favor of admissibility. Sandeen signed a written waiver. There is no evidence to suggest that Sandeen is incapable of understanding or reading English, and SA Faulkner spoke to him exclusively in English. Sandeen appeared to understand his rights, and SA Faulkner reviewed his rights one-by-one. SA Faulkner told Sandeen that he was

aware that Sandeen had prior experience in the criminal justice system and Sandeen did not deny it.

Nor did SA Faulkner coerce Sandeen into making a statement.  Indeed, Sandeen himself raised the topic of his girlfriend's status, and SA Faulkner clearly told Sandeen that Sandeen's decision whether to waive his *Miranda* rights had no bearing on her arrest.  SA Faulkner wisely went so far as to explicitly tell Sandeen that he could not promise him anything.

The Court concludes that Sandeen knowingly, intelligently, and voluntarily waived his *Miranda* rights and that the statement he made was not the product of coercion.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Motions.  The evidence obtained from the searches of the vehicles and Defendant's statements to SA Faulkner in Exhibit 1D are admissible at trial.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, June 16, 2021.



_____

Jill A. Otake
United States District Judge

CR 19-00167 JAO, *United States v. Sandeen;* ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS, ECF NOS. 93, 94, AND 95